**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEVEN GUCCIARDI and REGINA | : | |
| GUCCIARDI, h/w, | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | NO.  12-932 |
| BONIDE PRODUCTS, INC., LOWE'S | : | |
| COMPANIES, INC. d/b/a LOWE'S | : | |
| HOME IMPROVEMENT WAREHOUSE, | : | |
| LOWE'S, LOWE'S d/b/a LOWE'S OF | : | |
| NORTH WILMINGTON DELAWARE, | : | |
| NATIONWIDE CHEMICAL PRODUCTS, | : | |
| INC., and NCP OF NORTHWEST | : | |
| OHIO, INC., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                   June 24, 2014

Currently pending before the Court are: (1) a Motion for Summary Judgment by

Defendant Bonide Products, Inc.; (2) a Second Motion for Summary Judgment by Defendant

Nationwide Chemical Products, Inc.; and (3) First and Second Motions for Summary Judgment

by Defendant NCP of Northwest Ohio, Inc.  For the following reasons, the Motions are denied.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

The present matter is a products liability action brought by Plaintiffs Steven Gucciardi

and Regina Gucciardi, husband and wife, (collectively "Plaintiffs") against Defendants Lowe's

Companies, Inc. d/b/a Lowe's Home Improvement Warehouse, Lowe's, and Lowe's d/b/a

Lowe's of North Wilmington Delaware (collectively the "Lowe's Defendants"), Bonide

Products, Inc., Nationwide Chemical Products, Inc., and NCP of Northwest Ohio, Inc.

       Plaintiffs purchased their new home at eighty-seven Carter Way, Glen Mills, Pennsylvania in 1984.  (Pls.' Resp. Opp'n Bonide's Mot. Summ. J., Ex. 1, Dep. of Steven Gucciardi ("S. Gucciardi Dep."), 36:7–8, Mar. 8, 2013.)  Sometime in 2003 to 2004, Steven Gucciardi bought a can of Bonide Termite and Ant Control (the "Product"), but did not use it until November 2006.  (Id. at 61:3–9; Pls.' Resp. Opp'n Bonide's Mot. Summ. J., Ex. 8.)  The Product was originally manufactured by Defendant Nationwide Chemical Products, Inc. and sold to Bonide, who distributed the Product to various wholesalers and retailers.  (Pls.' Resp. Opp'n Bonide's Mot. Summ. J., Ex. 4, Dep. of James Wurz ("Wurz Dep."), 93:20-94:16, Sept. 6, 2013.)

       On approximately January 24, 2010, Mr. Gucciardi was cleaning out his basement and saw some black insects crawling on the concrete wall.  (S. Gucciardi Dep. 68:13–21.)  He got the Bonide Termite & Carpenter Ant Control Product, shook it up, "glanced" at the label, and sprayed it on the wall.  (Id. at 72:11–73:20.)  The process took a total of approximately twenty minutes to a half hour, which included moving his ladder and moving objects away from the wall.  (Id. at 74:13–76:1.)  Altogether, however, he actually sprayed the bugs for only about two minutes and used about a third to a half of the can.  (Id. at 76:2–6.)  Prior to doing so, he noted the instructions that said to spray in the area of the infestation and to wear glasses and long sleeves, both of which he was wearing.  (Id. at 76:10–24.)  After he was done spraying, he left the windows open in the basement for approximately four to five hours.  (Id. at 82:15–24.)

       On January 25, 2010—the last evening he slept in his house—he experienced an elevated or rapid heartbeat, had a headache, and felt nauseous.  (Id. at 91:19–92:9, 99:1–12.)

2

Subsequently, due to the overwhelming odor and resulting symptoms, he did not return to the house until January 30th or 31st, and thereafter only sporadically in order to pick up some items. (Id. at 99:1–20, 115:11–23.)  Plaintiffs' expert, Wayne K. Ross, M.D., opined that the Product caused a direct toxic effect to Mr. Gucciardi on the day of administration, resulting in "a series of neurotoxic signs and symptoms including headache, dizziness, agitation and fatigue" and that "Mr. Gucciardi continues to have adverse effects from the contaminated fumes at the residence" which are "permanent."  (Pls.' Resp. Opp'n Summ. J., Ex. 3, Expert Report of Wayne Ross, M.D. ("Ross Report"), at 8.)  Dr. Ross also concluded that "the continued presence of the contaminated fumes at his residence is so prevalent that the fumes would render any individual incapable of normally living in and breathing the atmospheric conditions at his residence."  (Id.)

Mr. Gucciardi's wife, Regina Gucciardi, was away in Key West, Florida when her husband sprayed the Product on January 24, 2010.  (Pls.' Resp. Opp'n Summ. J., Ex. 5, Dep. of Regina Gucciardi ("R. Gucciardi Dep."), 15:9-13, Mar. 8, 2013.)  Although she returned to town approximately a week later, Ms. Gucciardi did not go into her home until early April.  (Id. at 17:1–12.)  When she did enter the home, she remarked that the home had a horrible smell and she stayed only forty-five minutes to an hour, just long enough to open the windows.  (Id. at 18:1–12.)  Her lips began to burn and she felt light-headed.  (Id. at 19:23–20:1.)  Each time she subsequently entered the house, she felt successively worse.  (Id. at 20:1–5.)  Dr. Ross observed that after her exposure to the Bonide Product, "Ms. Gucciardi developed burning lips, lightheadedness, nausea, headaches, eye irritation, dizziness, fatigue, profuse sweating, chemical hypersensitivity, weight loss and impaired concentration."  (Ross Report 8.)  On April 12, 2011, Mrs. Gucciardi was diagnosed with Reactive Airway Disease, which Dr. Ross believes was

3

caused by the environmental exposure to the pesticide.  (Id. at 4.)  Plaintiffs have presented evidence that several other individuals who have entered the home since use of the Product have suffered adverse health effects.

Plaintiffs' toxicology expert, Gary Whitmyre, has opined that the "Bonide Termite and Carpenter Ant Control aerosol product has rendered the Gucciardi home uninhabitable" and has noted that "[b]ecause of the adverse reactions still experienced by Steve and Gina Gucciardi when they enter their home, they will never be able to re-occupy their home and have a normal life there."  (Defs.' Mot. Summ. J., Ex. F, Expert Report of Gary Whitmyre ("Whitmyre Report"), 4.)  Thus, he concluded that the residence represents a permanent non-recoverable loss to Plaintiffs.  (Id. at 19.)

On January 17, 2012, Plaintiffs initiated the current litigation in the Court of Common Pleas of Philadelphia County, alleging several claims.  First, Plaintiffs set out a cause of action for strict liability, as follows:

> At the time and place aforesaid, Defendants, through its agents, servants, workmen, and/or employees, who were acting within the scope of their authority and within the course of their employment, breached their duties and obligations as designers, formulators, composers, manufacturers, producers, marketers, sellers, installers and/or distributors of the product involved herein under Section 402(a) of the *Restatement of the Law of Torts-Second* in *inter alia:*
>
> a.   Manufacturing, composing, formulating, designing, producing, selling and/or distributing the product that was unreasonably dangerous at the time of its original manufacture and sale;
>
> b.   Manufacturing, composing, formulating, designing, producing, selling and/or distributing the product that was unsafe and defective in its design, composition, formulation and manufacture;
>
> c.   Failing to properly design, compose, formulate, manufacture, inspect, test, service, distribute and/or sell products such as the one in question;
>
> d.   Failing to use reasonable care in the design, manufacture,

4

composition, formulation, inspection, testing, servicing, distributing, and/or sale of the product, as the one in question;

e.  Failing to discover the defects and unsafety in said product;

f.  Failing to design, manufacture and/or formulate said product;

g.  Failing to make reasonable inspections of the product prior to the time of its original sale and distribution to discover the defects present in same;

h.  Failing to warn plaintiffs of the defects;

I.  Failing to give adequate warnings and directions with respect to the product;

j.  Failing to equip the product with proper safeguards and safety devices;

k.  Failing to design, compose, formulate, manufacture and sell the product in a safe condition;

l.  Failing to comply with the federal and state statutes, administrative regulations promulgated pursuant thereto pertaining to the design, formulation, composing manufacture, production, sale, distribution and/or maintenance of the products such as the one involved herein;

m.  Failing to give appropriate instructions as to the use and maintenance with regard to the product; and/or

n.  Otherwise failing to conform to their duties and obligations as designers, formulators, composers, manufacturers, producers, marketers, sellers, installers and/or distributors of the product.

(Compl. ¶ 23.)  Second, Plaintiffs claim negligence based on all of the foregoing conduct, plus the following additional conduct/theories:

n.  Pursuant to the Doctrine of *Res Ipsa Loquitur*;

o.  Failing to use due care under all of the circumstances;

p.  Negligence, carelessness, wantonness and other tortuous [sic] conduct at law;

q.  And such other acts that shall appear in the course of discovery conducted pursuant to the Rules of Civil Procedure; and/or

r.  Otherwise failing to exercise due care under the circumstances.

(Id. ¶ 32.)  Third, Plaintiffs set forth a cause of action for breach of warranty, alleging in part as follows:

40.  Defendants knew at the time of designing, formulating, composing, manufacturing, distribution and/or sale of the product of the particular purpose and use by the public of the product.

41.  Plaintiff Steven Gucciardi [and Plaintiff Regina Gucciardi] in using said

5

product, relied on the Defendant manufacturer, formulator, composer, distributor, and/or seller's skill and judgment that the same was fit for that particular purpose.

42.     The product was not fit for the particular purpose due to the manufacture, formulating, composing, failure to warn and/or design defects, which caused Plaintiff's injuries.

43.     As a result of the foregoing, Defendant breached its implied warranty of fitness for a particular purpose and any express warranties.

(Id. ¶¶ 40–43.)  Finally, Plaintiffs each claim loss of consortium.  (Id. ¶¶ 69–72.)  On February 22, 2012, Defendant Lowe's Home Centers, Inc. filed a Notice of Removal Action and successfully removed the matter to the United States District Court for the Eastern District of Pennsylvania.

On November 5, 2012, Defendant Nationwide Chemical Products, Inc. ("Nationwide") filed a Motion for Summary Judgment, which the Court denied.  On May 1, 2013, the parties stipulated to the dismissal of the Lowe's Defendants.  Between December 26 and 27, 2013, Defendant Bonide Products, Inc. ("Bonide") filed a first Motion for Summary Judgment, Defendant Nationwide Chemical Products, Inc. ("Nationwide") filed a Second Motion for Summary Judgment, and Defendant NCP of Northwest Ohio, Inc. ("NCP") filed First and Second Motions for Summary Judgment.  Plaintiffs submitted responses on January 16, 2014, and Defendant Bonide filed a Reply Brief on January 27, 2014.  The Motions are now ripe for judicial review.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is

"material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the

non-movant on that issue.  <u>Anderson</u>, 477 U.S. at 249–50.

## III.   DISCUSSION

As noted above, the remaining three Defendants—Bonide, Northwest, and NCP—have filed Motions for Summary Judgment.  All three Defendants claim that summary judgment is warranted on the negligence, strict liability, and warranty claims because they are preempted by the Federal Insecticide, Fungicide & Rodenticide Act.  In addition, they all contend that there is no evidence of outrageous conduct on the part of any Defendant sufficient to support Plaintiffs' claim for punitive damages.  Finally, Defendant NCP argues that it is not the successor company to Nationwide and could not possibly have been responsible for the manufacturing or distribution of the Product to Bonide that was responsible for Plaintiffs' injuries.  The Court addresses these arguments individually.

### A.   <u>Whether the Negligence, Strict Liability, and Warranty Claims Are Preempted</u>

All remaining Defendants seek dismissal of Plaintiffs' negligence, strict liability, and warranty claims under a theory that the Federal Insecticide, Fungicide, & Rodenticide Act ("FIFRA"), 7 U.S.C. § 136v(b) preempts such claims.  The Court finds no merit to this contention.

"FIFRA is a comprehensive regulatory statute that covers, among other things, the use, sale, and labeling of pesticides."  <u>Mortellite v. Novartis Crop Prot., Inc.</u>, 460 F.3d 483, 488 (3d Cir. 2006).  "FIFRA requires a manufacturer seeking to register a pesticide to submit a proposed label to the EPA along with supporting data."  <u>Id.</u> (citing 7 U.S.C. § 136a(c)(1)(C), (F).  If the EPA determines that the pesticide is "effacious" and "will not cause unreasonable adverse effects

on humans and the environment, and that its label complies with FIFRA's prohibition on

misbranding," it will register the pesticide.  Id.  "A pesticide is 'misbranded' under FIFRA if its

label contains a statement that is 'false or misleading in any particular,' does not contain

adequate instructions for use, or omits necessary warnings or cautionary statements."  Id. (citing

7 U.S.C. § 136(q)(1)(A), (F), (G).  FIFRA further provides that states "shall not impose or

continue in effect any requirements for labeling or packaging in addition to or different from

those required under this subchapter."  7 U.S.C. § 136v(b).  The statute defines "label" as "the

written, printed, or graphic matter on, or attached to, the pesticide or device or any of its

containers or wrappers."  7 U.S.C. § 136(p)(1).  It goes on to define "labeling" as: "all labels and

all other written, printed, or graphic matter— (A) accompanying the pesticide or device at any

time; or (B) to which reference is made on the label or in literature accompanying the pesticide or

device, except to current official publications of the Environmental Protection Agency, the

United States Departments of Agriculture and Interior, the Department of Health and Human

Services, State experiment stations, State agricultural colleges, and other similar Federal or State

institutions or agencies authorized by law to conduct research in the field of pesticides."  7

U.S.C. § 136(p)(2).

     In Bates v. Dow Agrosciences LLC, 544 U.S. 431 (2005), the United States Supreme

Court clarified the scope of FIFRA preemption of state law causes of action, including

negligence, strict liability, and breach of warranty.  In that matter, the plaintiffs were peanut

farmers who brought suit against a pesticide manufacturer based on alleged injuries to their

crops, claiming that the pesticide's label stated that it was recommended for use in the areas

where the peanut farmers experienced crop damage.  Id. at 435.  Alleging various claims under

Texas state law, the farmers theorized that the pesticide was unsafe for crops grown in soil with a pH level of 7.0 or greater.  Id.  The district court and court of appeals dismissed several claims under FIFRA's preemption provision on the grounds that finding liability on a state law theory "would give [the defendant] a 'strong incentive' to change its label."  Id. at 436.  The Supreme Court rejected this "inducement" test and reversed, stating that an "event, such as a jury verdict, that might 'induce' a pesticide manufacturer to change its label" should not be deemed an action imposing a new labeling requirement in conflict with FIFRA.  Id. at 445.  It further reasoned that, even where a claim would impose a requirement to change a label, such a claim is not preempted by FIFRA unless it imposes a requirement in addition to or different from those under FIFRA. Id. at 444.  In accord with this reasoning, the Supreme Court enumerated a two part test to determine whether a state statue or common law claim is preempted by FIFRA.  Id.  First, the statute or common law rule must create a requirement for labeling or packaging.  Id.  Second, the labeling or packaging requirement must be in addition to or different from those required under FIFRA.  Id.  Only if an action fulfills both requirements of the test is it preempted by FIFRA.  Id. Ultimately, the Supreme Court held that "[r]ules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirement for 'labeling or packaging.'  None of these common-law rules requires that manufacturers label or package their products in any particular way."  Id. at 444 (finding that petitioners' claims for defective design, defective manufacture, negligent testing, and breach of express warranty were not preempted).

Following Bates, the Third Circuit issued several decisions clarifying and applying the

principles enumerated by the Supreme Court.  In <u>Indian Brand Farms, Inc. v. Novartis Crop Prot.</u> <u>Inc.</u>, 617 F.3d 207 (3d Cir. 2010), the Third Circuit interpreted preemption narrowly.  <u>Id.</u> at 221–22.  Acknowledging that pre-<u>Bates</u> decisions held that failure-to-warn claims based on inadequate labeling were preempted by FIFRA, it noted that the <u>Bates</u> court "made clear that failure-to-warn claims were not preempted unless they would impose a requirement '*in addition to* or *different from'* those required by FIFRA."  <u>Id.</u> (emphasis in original) (quoting <u>Bates</u>, 544 U.S. at 447).  It remarked that "FIFRA's misbranding provisions require 'warning[s] or caution statement[s] which may be necessary . . . to protect health and the environment.'"  <u>Id.</u> at 222 (quoting 7 U.S.C. § 136(q)(1)(G)).  Thus, the Third Circuit found that to the extent the state law does not impose any duty that does not come within this statutory text, that law does not impose a duty inconsistent with or in addition to the duty imposed by FIFRA's misbranding provision and is thus not preempted by FIFRA.  <u>Id.</u>

In <u>Mortellite v. Novartis Crop Prot., Inc.</u>, 460 F.3d 483 (3d Cir. 2006), the Third Circuit considered whether FIFRA's preemption provision barred the plaintiff farmers' claims of strict liability, negligent testing, and breach of warranty based on insecticide that damaged their crops. <u>Id.</u> at 489.  Applying the reasoning in <u>Bates</u>, the court found that "FIFRA does not preempt claims based on theories of strict liability, negligent testing, and breach of express warranty [because] such common law claims plainly do not impose labeling requirements, and therefore cannot conflict with FIFRA."  <u>Id.</u> at 490.  It further noted that "[w]hile success on these claims may induce Defendant to change the label, this 'attenuated pressure' does not amount to a 'requirement' within the meaning of FIFRA's preemption provision."  <u>Id.</u>

In the present case, Plaintiffs' claims do not address the Product's label at all; rather they

11

allege that the Product was defective and injured them.  More specifically, Plaintiffs's strict

liability and negligence claims assert that Defendants' manufacture, composition, formulation,

design, production, testing, sale, and distribution of the Product was unsafe and defective, and

that Defendants failed to discover and warn of such dangers.  Further, Plaintiffs' breach of

warranty claim asserts that the Product was not fit for the particular purpose due to the

manufacture, formulating, composing, failure to warn, and/or design defects, and, therefore,

Defendants breached their implied warranty of fitness for a particular purpose and any express

warranties.  The Third Circuit has expressly held that such claims are not preempted by FIFRA

because they do not implicate the Product's label.  Nor does this Court find that such claims

impose any obligations in addition to or greater than those required by FIFRA.  The mere fact

that Plaintiffs' success on these claims could induce Defendants to change their label on the

Product does not equate to a labeling "requirement" that is inconsistent with FIFRA.[1]

     Defendants' contrary arguments are unavailing.  First, Defendants cite to 40 C.F.R. §

152.112, entitled "Approval of registration under FIFRA § 3(c)(5)," which describes when the

EPA will approve an application under the criteria of FIFRA.  Defendants go on to contend that,

by virtue of EPA approval, the federal administrative agency makes a determination that the

composition of the Product supports the efficacy claims, that the Product will perform its

---

[1] Defendant Bonide argues that Bates held that "negligent-failure to warn claims are premised on common-law rules that qualify as 'requirements for packaging' and are preempted." (Def. Bonide's Reply Br. 8.)  This is a mis-characterization of Bates.  The Supreme Court actually held that "[u]nlike their other claims, *petitioners'* fraud and negligent-failure-to-warn claims are premised on common-law rules that qualify as 'requirements for labeling or packaging.'" Bates 544 U.S. at 446 (emphasis added).  The Supreme Court took care to note that a "state-law labeling requirement is not preempted by § 136v(b) if it is equivalent to, and fully consistent with, FIFRA's misbranding provisions."  Id. at 447.  Bonide has not shown that Plaintiffs' failure to warn claims have anything to do with labeling.

intended function without unreasonable adverse effects, and that the Product is not misbranded.

This argument, however, completely misunderstands the scope of the preemption provision.

FIFRA only provides that states "shall not impose or continue in effect any requirements for

*labeling or packaging* in addition to or different from those required under this Act."  7 U.S.C. §

136v(b) (emphasis added).  FIFRA contains no provision preempting all state law claims relating

to the efficacy or dangers of the Product.  Moreover, to the extent that Defendants' contend that

the mere existence of the registration negates Plaintiffs' claims that the Product was dangerous,

they are mistaken.  FIFRA states that "[i]n no event shall registration of an article be construed as

a defense for the commission of any offense under this subchapter.  As long as no cancellation

proceedings are in effect registration of a pesticide shall be *prima facie evidence* that the

pesticide, its labeling and packaging comply with the registration provisions of the subchapter."

7 U.S.C. § 136a(f) (emphasis added).  Accordingly, while the registration provision creates a

*presumption* that the Product is not dangerous, it does not foreclose proof to the contrary.

Alternatively, Defendants cite to <u>Sowers v. Johnson & Johnson, et al.</u>, 867 F. Supp. 306

(E.D. Pa. 1994), where the plaintiff complained of personal injuries related to exposure of an

EPA-approved product.  <u>Id.</u> at 308.  In that case, the court held that the preemptive scope of §

136v(b) encompasses state common law actions and that the plaintiff's claims of negligence,

strict liability, and breach of implied warranty were preempted.  <u>Id.</u> at 312.  Defendants, however,

fail to note that <u>Sowers</u> was written well before the issuance of <u>Bates</u> and <u>Indian Farms</u>.

Although <u>Sowers</u> was never expressly abrogated, the holdings of the cases on which it relied

have all been called into doubt and the Third Circuit has explicitly rejected the underpinnings of

<u>Sowers</u>.  Therefore, the Court does not give weight to this case in deciding the current Motion.

Lastly, Defendant Bonide—for the first time in its Reply Brief—raises a scattershot argument that the preemption requirements of 7 U.S.C. § 136v(b), as interpreted by <u>Bates</u>, apply only to the manufacturer and not a distributor like Bonide.  It goes on to discuss, at some length, how the EPA imposes different requirements for manufacturers and distributors and precisely what conditions a manufacturer and supplemental distributor must meet in order to obtain registration.  As Bonide is not the manufacturer, it contends that any claim for defective manufacture, negligent testing, and failure to warn must fail.  Bonide then cites to <u>Mutual Pharm. Co., Inc. v. Bartlett</u>, 133 S. Ct 2466 (2013) for the proposition that "[e]ven in the absence of an express pre-emption provision, the Court has found state law to be impliedly pre-empted where it is 'impossible for a private party to comply with both state and federal requirements.'" <u>Id.</u> at 2468–69 (quotations omitted).  Relying on that principle, Bonide claims that "[t]o suggest that the Plaintiffs have a claim for defective design, defective manufacturer and/or negligent testing would be improper because this completely conflicts with the EPA requirements for the supplemental distribution."  (Def. Bonide's Reply Br. 4.)  Finally, Defendant Bonide engages in a discussion of the substantive elements of negligence, strict liability, and breach of warranty in an effort to prove—without citation to any evidence[2]—that Plaintiffs cannot establish liability against Bonide.

Aside from the facts that (1) Bonide cites to no law that the FIFRA preemption provision,

---

[2]  Bonide suggests that the Court can take judicial review of the EPA's website showing that propoxur, the chemical at issue in the Product, is currently used at 9% concentration in flea collars (nine times higher than the concentration in this case) as of the present date.  The Court does not understand how this apparent hearsay evidence about propoxur's use with animals disproves Plaintiffs' case, particularly in light of Plaintiffs' various expert reports linking the propoxur in the Product to Plaintiffs' claimed injuries.

as construed by <u>Bates</u>, applies differently to manufacturers and distributors, (2) Bonide cannot

show that compliance with both state law and FIFRA is "impossible," and (3) Bonide has not

shown the absence of a genuine issue of material fact as the substantive merits of Plaintiffs

claims, Bonide's Reply Brief arguments fail at a very elemental level—Bonide never raised them

in its Motion for Summary Judgment.  It is well established that "[a] reply brief is intended only

to provide an opportunity to respond to the arguments raised in the response brief; it is not

intended as a forum to raise new issues." <u>U.S. v. Martin</u>, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa.

2006).  Although reply briefs may be used to respond to points made in the opposing party's

papers, it "generally cannot be used to expand the issues presented for adjudication beyond those

raised in the moving papers."  <u>Sproull v. Golden Gate Nat'l Senior Care, LLC</u>, No. Civ.A.08-

1107, 2010 WL 339858, at *3 (W.D. Pa. Jan. 22, 2010).  Where a reply brief raises new

arguments in support of a motion for summary judgment, the district court is justified in

disregarding them.  <u>Frankentek Residential Sys., LLC v. Buerger</u>, __ F. Supp. 2d ___, 2014 WL

1623775, at *4 n.11 (E.D. Pa. Apr. 24, 2014).

Presumably, Defendant Bonide's Reply Brief was an effort to respond to Plaintiffs'

lengthy Opposition Brief arguments attempting to show the merits of their substantive claims.

Plaintiffs' responsive arguments, however, are irrelevant to the pending motions because no

Defendant ever challenged the substantive elements of the claims in their initial moving papers,

and Plaintiffs themselves have not moved for summary judgment.  Defendant Bonide's

Memorandum in Support of Summary Judgment presents simply a two-page argument regarding

the negligence, strict liability, and warranty claims, arguing only that these claims are preempted

by FIFRA because they implicate "labeling" and citing only to pre-<u>Bates</u> law.[3]  At no point did

Bonide discuss any theory that <u>Bates</u> and its progeny—controlling authority of which Bonide

should have been aware—should not be applicable to distributors.  Nor did Bonide attempt to

show that no evidence supports Plaintiffs' claims.  Accordingly, the Court declines to consider

such new arguments.[4]

      In short, under the explicit dictates set forth by the United States Supreme Court and the

Third Circuit, Plaintiffs' claims of negligence, strict liability, and breach of warranty fall outside

the preemption provision of FIFRA.  Accordingly, Defendants' Motions for Summary Judgment

are denied on this ground.

      **B.**    <u>**Whether Summary Judgment is Warranted as to Plaintiffs' Claims for Punitive Damages**</u>

      In their second argument, all Defendants allege that they are entitled to summary

judgment as to Plaintiffs' claim for punitive damages.  Again, the Court finds this argument

meritless.

      The standard for awarding punitive damages under Pennsylvania law is well-established:

      Punitive damages may be awarded for conduct that is outrageous, because of the

---

[3]  Defendant Bonide makes a singular statement in its moving papers that "Plaintiffs have failed to meet any of the requirements of these three alleged causes of action and there is no expert opinion as to these requirements."  (Def. Bonide's Mem. Supp. Summ. J. 8.)  It immediately follows that statement, however, with the conclusion that "Plaintiffs' claims are preempted and Defendant is entitled to summary judgment as a matter of law."  (<u>Id.</u>)  The initial sentence does not suffice to raise a challenge to the substantive elements of Plaintiffs' claims, particularly in light of the fact that the entire legal discussion in this section rests on a preemption theory.

[4]  As indicated above, even if the Court were to consider such arguments, they have no merit given Plaintiffs' experts' reports which raise genuine issues of material facts regarding these claims.

defendant's evil motive or his reckless indifference to the rights of others . . . [a]s the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct.

Hutchison ex. rel. Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005) (internal quotations and citations omitted). While ordinary negligence will not support an award of punitive damages, "punitive damages are appropriate for torts sounding in negligence when the conduct goes beyond mere negligence and into the realm of behavior which is willful, malicious, or so careless as to indicate wanton disregard for the rights of the parties injured." Id. (citation omitted).  A defendant acts recklessly when "his conduct creates an unreasonable risk of . . . harm to another [and] such risk is substantially greater than that which is necessary to make his conduct negligent." Id. at 771 (quoting Restatement (Second) of Torts § 500).

In the present case, Defendants' argument as to punitive damage consists of a recitation of the foregoing standards followed by the bald contention that "Plaintiff has not adduced any evidence to establish that Moving Defendant had an evil motive and/or acted outrageous because of the defendant's evil motive or reckless indifference to the rights of others."  (Def. NCP's Mem. Supp. Second Mot. Summ. J. 13; Def. Bonide's Mem. Supp. Summ. J. 10; Def. Nationwide's Mem. Supp. Summ. J. 13.)  Plaintiffs, however, offer sufficient evidence to withstand summary judgment review.  As to Defendant Bonide, Plaintiffs cite their expert reports and argue that Bonide failed to determine the safety of the Product, despite longstanding literature that established the Propoxur was inappropriate for indoor residential use.  (Pl.'s Resp. Opp'n Bonide Mot. Summ. J. 25.)  As to Defendants Nationwide and NCP, Plaintiffs assert that "Michael Borges [of Nationwide] did not do any safety testing on the product. . . . He did not

17

determine from David Valentine [original owner of Nationwide] if any tests had been done to determine the safety of the product. . . . When Michael Borges sold Defendant, Nationwide Chemicals, Inc. to Herb Eckhart, he did not determine if Mr. Eckhart had any experience in the pesticide industry." (Pl.'s Resp. Opp'n NCP Mot. Summ. J. 34.) Plaintiffs now aver that these actions constituted deliberate indifference to the safety of the Product and the rights of the Plaintiffs, which directly resulted in Plaintiffs' injuries.

While Plaintiffs have not conclusively established an entitlement to punitive damages, their argument and evidence are sufficient to create a genuine issue of material fact as to whether Defendants' actions rose to the level of deliberate indifference. As such factual determinations are not proper during summary judgment review, the Court finds that the issue of punitive damages is properly submitted to a jury.

### C.   Whether Defendant NCP of Northwest Ohio Inc. Is the Proper Successor Company to Nationwide Chemical Products Inc.

In the last argument, Defendant NCP contends that it was formed in the State of Ohio on January 14, 2010, operated under the trade name Nationwide Chemical Products which was registered on January 21, 2011, and is currently in the midst of a dissolution, meaning it could not have played any role in the events at issue. (Def. NCP's First Mot. Summ. J., Ex. A.) It goes on to assert that NCP was not a successor corporation to Nationwide, which was dissolved on November 26, 2003, "as was attested to by at least four people under oath in a deposition." (Def. NCP's Mem. Supp. First Mot. Summ. J. 2.)   NCP then cites its evidence as follows:

1. Michael Borges, the owner of Nationwide Chemical Products, Inc. – He claimed he never met Joseph Bassett Jr. and had no affiliation with him whatsoever.

18

2.     Joseph Bassett Jr., owner and 1/3 shareholder in NCP of Northwest Ohio stated he never met Michael Borges and had no affiliation with Nationwide Chemical Products, Inc., and only took the name as a trade name because Herb Eckhart provided him with thousands of labels for Prokill Choice an all natural pesticide using Permethrin, a plant extract as its active ingredient (See copy of label Exhibit B).  These labels had Nationwide Chemical Products (not "INC.") on the back of them.  So in order to spare extra expense Mr. Bassett used them and registered the trade name.   Mr. Bassett never manufactured or distributed a product which contained Propoxur which is the active ingredient the Plaintiff claims injured him and his wife.

3.     Herb Eckhart, a person of interest who purchased product licenses from Michael Borges subsequent to the dissolution of Nationwide Chemical Products Inc. Mr. Eckhart also happens to be the Grandfather to Joseph Bassett, Jr.'s children and acquainted to Mr. Bassett.  Mr. Eckhart operated as Nationwide Chemical Products as a sole proprietorship and distributed a product named Prokill Choice whose active ingredient was Permethrin EPA Registration number 9591-170, an all natural ingredient made from plant extract.  Plaintiff claims he was injured by ProKill Expel Roach and Ant Killer whose active ingredient is Propoxur, EPA Registration number 9591-124.   Obviously these are two vastly different products.   Propoxur's registration number was cancelled on July 21, 2005 (See Exhibit C [printout of page from www.pesticideinfo.org website regarding information on Prokill Expel Roach and Ant Killer]).  Mr. Eckhart failed to pay for its renewal because he wasn't manufacturing or distributing that product or pesticides at all.  Mr. Eckhart was in the pesticide business briefly until he filed for bankruptcy in late 2004 and abandoned his pesticide business.  Attached is a letter dated November 19, 2004 from the Bankruptcy Trustee Ericka Parker to Mr. Eckhart's business landlord stating Mr. Eckhart's intent to abandon the pesticide inventory and equipment remaining on the landlord's property.  See Exhibit D.  In Mr. Eckhart's closure of business in 2004 and bankruptcy and Mr. Bassett's January 2010 entry into the pesticide business at Mr. Eckharts urging, shows a significant break in any product distribution, and relationship from Nationwide Chemical Products Inc., and certainly should be sufficient to dispute any continuity of business or product theory presented by Plaintiff.

4.     Mr. Vickers from Bonide Products also attested to the fact that he had no dealings with NCP of Northwest Ohio Inc. And had never met or done business with Joseph Bassett Jr.

(Def. NCP's Mem. Supp. First Mot. Summ. J. 3–4.)  Based on this evidence, NCP reasons that

NCP is not a successor company to Nationwide and, therefore, cannot be held liable for

Plaintiffs' injuries.

NCP's argument fails for several reasons.  Primarily, although NCP purports to have evidence in the form of deposition testimony from the foregoing individuals, NCP fails to provide any such testimony or other evidence to the Court.  To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323–24.  The Court cannot simply rely on NCP's characterizations of what the deposition testimony or other evidence says.

Moreover, Plaintiffs present ample contradictory evidence to support the notion that NCP may, in fact, be the successor corporation to Nationwide.  In Dawejo v. Jorgensen Steel Co., 434 A.2d 106, 110 (Pa. Super. 1981), the Pennsylvania Superior court adopted the "product-line exception," which states that:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

Id. (quotations omitted).  This exception was later expressly adopted by the Pennsylvania Supreme Court.  See Schmidt v. Boardman Co., 11 A.3d 924, 945 (Pa. 2011) (adopting the product-line exception as set forth in Dawejo).  In addition, the United States Court of Appeals for the Third Circuit has interpreted Pennsylvania's product line exception to have three additional prerequisites:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business,
> (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and
> (3) the fairness of requiring the successor to assume a responsibility for defective

20

products that was a burden necessarily attached to the original manufacturer's good
will being enjoyed by the successor in the continued operation of the business.

Kradel v. Fox River Tractor Co., 308 F.3d 328, 331–32 (3d Cir. 2002).  Notably, a plaintiff need

not prove that the successor continued to produce the same exact product, but must only show

that the successor "continued to manufacture the same general line of business."  Van Doren v.

Coe Press Equip. Corp., 592 F. Supp. 2d 776, 788 (E.D. Pa. 2008) (quotation omitted).  "Courts

applying the product line exception have consistently found that the question of whether each

particular required factor has been satisfied is a question for the jury."  Id.[5]

Plaintiffs have put forth sufficient evidence to create a genuine issue of material fact as to

whether NCP has successor liability for Nationwide.  Specifically, they note that David Valentine

began Nationwide Chemicals, Inc. ("Nationwide") in approximately 1976.  (Pls.' Resp. Opp'n

NCP First Mot. Summ. J., Ex. 2, Dep. of David Valentine ("Valentine Dep."), 38:6–24, Sept. 27,

2013.)  On approximately July 29, 1982, Nationwide became involved with Pro Kill Expel

Roach and Ant Killer, EPA registration number 9591-124.  (Id. at 39:20–41:3.)  Nationwide

owned both the label and the EPA registration number for the Product and sold it, but did not

manufacture it.  (Id. at 53:19–55:21.)

In January 1996, Mr. Valentine sold Nationwide to Michael Borges.  (Id. at 61:5–62:22.)

Valentine then notified the EPA, on January 15, 1996, that the agent of record for the registration

changed to Michael Borges.  (Id. at 66:10–66:24.)  Borges bought whatever remaining active

ingredient Nationwide had, some miscellaneous material, equipment, and EPA registrations.

(Pls.' Resp. Opp'n NCP First Mot. Summ. J., Ex. 3, Dep. of Michael Borges ("Borges Dep.

---

[5]  Interestingly, NCP's brief does not acknowledge any of this law.

45:11–19, July 24, 2013.)  On March 1, 1996, Borges incorporated Nationwide Chemical

Products, Inc.  (Id. at 43:2–45:10.)  Accordingly, at the time Valentine dissolved his corporation,

Borges formed his corporation.  (Id. at 43:2–24.)

Nationwide Chemical Products, Inc. then used the same formula that Valentine and

Nationwide had used for Pro Kill Expel Roach and Ant Killer.  (Id. at 73:1–7.)  In November

1996, Nationwide Chemical Products, Inc. filed a supplemental registration with the EPA

notifying the agency that Defendant Bonide would be using is formula and label for the Pro Kill

Expel Roach and Ant Killer.  (Valentine Dep. 60:8–15.)  Nationwide Chemical Products, Inc.

continued its sale of the Product until 2003, when Borges sold the company.  (Borges Dep.

119:5–18.)  Prior to that time, however, Bonide had found a product that was cheaper and had

stopped buying from Nationwide Chemical Products, Inc.  (Id. at 119:22–120:6.)

Following Nationwide Chemical Products, Inc.'s dissolution by Borges in 2003, Herb

Eckhart purchased the company.  (Pls.' Resp. Opp'n NCP First Mot. Summ. J., Ex. 6, Dep. of

Herbert Eckhart ("Eckhart Dep."), 36:7–24, Sept. 18, 2013.)  Although Borges had paid for the

EPA registration numbers through January 15, 2004, Borges sent a letter to the EPA informing

them that Eckhart was a new agent of record for Nationwide Chemical Products, Inc.  (Id. at

37:21–38:24.)  As explained by Borges, Eckhart took the name directly from Borges even though

Eckhart did not actually buy the stock to take over a company that already had that name and

even though there was nothing left of Nationwide Chemical Products, Inc. as owned by Borges.

(Borges Dep. 180:11–181:23.)  After completing this purchase, Eckhart sold only the Pro Kill

Choice Insect Spray, EPA registration number 9591-169, and never sold Pro Kill Expel Roach

and Ant Killer, EPA registration number 9591-124.  (Eckhart Dep. 44:11–46:7.)  He continued to

manufacture the Pro Kill Choice Insect Spray until he filed for Chapter 7 Bankruptcy in September 2004.  (Id. at 55:10–57:21.)  After the bankruptcy, Eckhart continued to pay the registration fee for the Pro Kill Choice Insect Spray in hopes to recoup some money.  (Id. at 9:12–21.)  After paying it late one year, the registration lapsed and he re-filed it under registration number 9591-170.  (Id. at 60:7–20.)

Joseph Bassett formed NCP of Northwest Ohio Inc. in January of 2010, when he purchased the EPA registration for the pesticide, Pro Kill Choice Insect Spray, EPA registration number 9591-170.  (Pls.' Resp. Opp'n NCP First Mot. Summ. J., Ex. 7, Dep. of Joseph Bassett ("Bassett Dep."), 54:7–57:3, July 24, 2013.)  Bassett registered his company as NCP of Northwest Ohio, Inc. d/b/a Nationwide Chemical Products.  (Id. at 110:6–23.)  NCP of Northwest Ohio, Inc. is still in the business of selling pesticides. (Id. at 109:10–110:5.)

Based on this chain of ownership, Plaintiffs now argue that Nationwide Chemical Products, Inc. has been involved in the sale of pesticide products since its inception in 1976, and each purchaser of the company has continued to manufacture and distribute in the same general line of business.  As such, Plaintiffs assert that all of the factors necessary for the product-line exception have been satisfied in order to hold Defendant NCP of Northwest Ohio, Inc. liable for the manufacture and sale of the Product that allegedly injured Plaintiffs.

In light of this evidence, the Court simply cannot grant Defendant NCP's First Motion for Summary Judgment.  While many of the connections that Plaintiffs make between the various companies in this chain of events are tenuous at best, a question remains as to what rights and liabilities passed between them in connection with the Product at issue.  Given that NCP has presented no evidence to the Court to support an alternate version of events and given that the

23

Court cannot conclusively find that NCP is not the successor to the original owner and seller of the Product at issue, the Court must submit this issue to a jury for resolution.

**IV.    CONCLUSION**

For all of the foregoing reasons, the Court denies the four pending Motions for Summary Judgment submitted by the Defendants.  Under the prevailing case law, Plaintiffs' claims of strict liability, negligence, and breach of warranty do not appear to be preempted by FIFRA. Moreover, Plaintiffs have offered sufficient evidence and argument to create a genuine issue of material fact as to their entitlement to punitive damages.  Finally, Plaintiff has put forth sufficient evidence to show that Defendant NCP may be liable under the product-line exception.

An appropriate Order follows.